Gregory Eugene **NAPPER**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 08–CF–1554.

District of Columbia Court of Appeals.

Argued Feb. 15, 2011.
Decided June 9, 2011.

Christopher Kemmitt, Public Defender Service, with whom James Klein and Jacklyn Frankfurt, Public Defender Service, were on the brief, for appellant.

John P. Gidez, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Elizabeth Trosman, John P. Mannarino and Stephen J. Gripkey, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE–RIGSBY, THOMPSON, and OBERLY, Associate Judges.

THOMPSON, Associate Judge.

Appellant Gregory Napper was charged by indictment with first-degree murder while armed, possession of a firearm during a crime of violence, and carrying a pistol without a license, all in connection with the September 8, 2007 murder of Marvin Leon Carter. A jury found him guilty on all counts. On appeal, appellant argues (1) that the trial court erred in denying his motion to suppress statements he made while talking on his cell phone in a police interview room; and (2) that—no aiding and abetting instruction having been given—the evidence adduced at trial was insufficient to convict him of murdering Carter. We reject these contentions, and affirm the judgment of conviction.

## I.

The government presented the following evidence at trial. Carter was shot to death on September 8, 2007, at about 6:15 p.m., while driving in front of appellant's home, located at 2220 Prout Street, S.E. Carter spent the afternoon of September 8, 2007, with his friend Malik Reeves, Jr. Reeves testified that he had stolen two cars the previous night—a green one and a silver one—and that he and Carter were riding in the green car when they noticed it was getting low on gas.[1] They parked the green car in an alley next to appellant's house and got into the silver car with their friend Jamal. As they did so, appellant and some other men who were standing in the alley asked Carter and Reeves whether the green car belonged to them, and whether they lived in the house next to the alley. Jamal said "yeah," and laughed at the men. Reeves heard a short man standing next to appellant say "they are lying like sh*t." Jamal, Carter, and Reeves then drove away in the silver car.

The three young men eventually abandoned the silver car, and Reeves and Carter returned to Prout Street to retrieve the green car. There, Reeves saw several men sitting on the porch of 2220 Prout Street, and as he and Carter walked into the alley toward the green car, two of those men ran inside the house. Carter got behind the wheel of the green car, and Reeves sat in the front passenger seat. As Carter began to drive away, Reeves saw two men come out of the house and run toward the street. Reeves testified that appellant stepped into the middle of the street and pulled out a black semi-automatic gun. Reeves warned Carter to duck, and Carter did so, but nevertheless was hit when the gun was fired into the driver's side of the car. Carter, bleeding profusely from the gunshot, became "weak" and crashed the green car into a vehicle that belonged to appellant. Reeves, who was "in shock" as he tried to cover Carter's mouth to keep the blood from flowing out, testified that the shooter ran across Prout Street toward the playground on the opposite side of the street. Reeves stayed with Carter until he heard sirens, and then left the scene.[2] Reeves

1. Reeves received a letter of use immunity and was ordered to testify.

2. After Reeves had returned home following the shooting, he was with his friend Michael Tindle when the two saw some young men driving a van through the alley behind Reeves's house, followed by another young man on foot. Reeves pointed to the man on foot and, according to Tindle, said he was "the dude who killed [Carter]." However, Reeves had already told Tindle that the man who shot Carter was "fat," and the man in the alley looked nothing like that description. Tindle recognized the man on foot as their friend "Dino," and told Reeves who it was, at which point Reeves agreed that it was Dino,

later gave Detective Gail Russell–Brown, the lead investigator, a description of the shooter as chubby, 200–300 pounds, about 5'8", dark-skinned with facial hair and dreadlocks, and wearing a white t-shirt, blue jeans, and black Nike shoes. He also identified appellant as the shooter from a photo array.

Raymond Brooks, who had known appellant for eight or nine years and had been close friends with him, was also present at 2220 Prout Street at the time of the shooting. When Brooks arrived there, appellant was sitting on his porch with some other men from the neighborhood, including brothers Earl and Jamal Curley. Brooks testified that appellant became "disturbed or something" and "got up off his porch and left." Brooks remained standing on the porch, talking to the Curley brothers. Brooks's attention was eventually drawn to the alley to his right, where he heard some people yelling, with appellant yelling the loudest. Thereafter, appellant and a man named Charlie Smith, who was known as "Gutter" to his friends, ran past Brooks and went into appellant's house. Brooks testified that when appellant and Charlie came out of the house, "it look[ed] like [appellant] . . . had a gun or something in his [right] hand." Brooks did not see anything in Charlie's hand, and he did not hear appellant say anything as he left the house. Moments later, Brooks heard "tires going against the gravel" in the alley, and then two or three gunshots coming from the alley. He turned around

and saw "[Carter] get hit and all this blood come out [of] his mouth and then [Carter] crashed into [appellant's] car." Appellant ran back toward his house, and Brooks, who was still standing on the porch, heard appellant say "Guzzle or Gutter hit my car." As appellant ran up the porch steps, he bumped into Brooks, and Brooks saw the back of the gun in appellant's right hand, and also felt the gun as appellant brushed past him. Appellant then fled from the house, running toward Nicholson St., S.E. Charlie "disappeared" after the shots were fired.

Brooks also left the scene, walking in the same direction as appellant. Shortly thereafter, Brooks saw appellant near the intersection of Minnesota Avenue and Nicholson Street, S.E. Appellant approached Brooks, hugged him, told him he was "sorry," and then continued walking up Minnesota Avenue. Brooks then returned to the scene of the shooting, and was still there when appellant telephoned him and asked whether the police had gone inside appellant's house. Brooks subsequently received several calls and messages on his cell phone from appellant. In one of the messages, appellant told Brooks to call him back, and said "I want to know if you [are] okay," and "[w]e [are] supposed to be brothers, call me back."

Detective Russell–Brown interviewed Brooks on the evening of the shooting and the following day.[3] Brooks told the detec-

---

and not the shooter from Prout Street. Reeves testified that the man on foot did not look anything like appellant and that he (Reeves) knew at the time that the man on foot was not the man who shot Carter.

Although Reeves told Tindle shortly after the shooting that there was a second gunman whose gun jammed, he later told Tindle that there was only one person with a gun and testified at trial that he saw only one person with a gun—appellant.

3. Brooks initially told the police he did not know anything about the shooting, but after Detective Russell–Brown spoke to him about obstruction of justice and conspiracy to commit murder, and stated that "if you fool around with this fire you're going to get burned," Brooks agreed to talk. He denied that he told Detective Russell–Brown that he saw appellant with a gun simply because the police were pressuring him.

tive appellant's name, and gave her a description: 23 to 24 years old, about 5'7", 300 pounds, plaits in his hair, brown complexion, and wearing a red shirt and blue jeans. Brooks also gave the detective a description of Charlie: short and "stubby," 5'4" to 5'5", 215–220 pounds, dark complexion, small mustache, and low-cut hair. A few weeks before trial, Detective Russell–Brown showed Brooks a photo array that included Charlie's photo, and asked Brooks whether he recognized in the group of photographs anyone who was on the scene the day of the shooting. Brooks picked out the photograph of Charlie, identifying him as "the one that ran past me with [appellant] while [Brooks] was talking to [the Curley brothers]."[4]

On September 11, 2007, three days after the shooting, appellant appeared voluntarily at the police Homicide Office, and met with Detective Russell–Brown in an interview room. Two camera pods in the interview room recorded both the interview and the telephone calls that appellant made while he was alone in the room during three brief intervals. During both the first and second calls, which appellant made before he was placed under arrest, appellant told the person to whom he was speaking that "they"—presumably, the police—"know everything."[5] The telephone calls were played for the jury.

The defense theory was that Charlie Smith was the shooter and killed Carter. The defense presented testimony that, at the time of the shooting, Charlie was under court supervision and was required to wear a GPS tracking device that continu-ously tracked his movements and reported his whereabouts to a private company that monitored the tracking device. The tracking device transmitted his position to a satellite approximately once a minute. A representative from the tracking company testified that he was able to determine from the tracking data that Charlie was in the 2200 block of Prout Street at the time of the shooting, and that one minute and forty-five seconds after the shooting, Charlie was "down south and to the west of Prout Street," near the intersection of Minnesota Avenue and 22nd Street. This intersection is about a half block west of the playground toward which Reeves said he saw the shooter run, and is in the opposite direction from where Brooks testified that appellant headed after the shooting.

Mark Wimbush, appellant's nephew, was returning home to 2220 Prout Street on the day of Carter's murder when he found the street blocked off by police. Wimbush saw Brooks, whom he knew, standing near the playground across the street from 2220 Prout Street, and asked Brooks what had happened, to which Brooks responded that he did not know. Wimbush later asked Brooks why the police were about to tow Brooks's car, and again Brooks said that he did not know. Brooks and Wimbush then approached the police and asked why they were towing Brooks's car, and according to Wimbush, the detective replied "that we know that you know something and until you come and talk to us down at the precinct then we're going to take your car."[6]

---

4. Detective Russell–Brown also showed the same photo array to Reeves, and asked him whether he recognized anyone from the day of the shooting. Reeves responded by saying "[i]t ain't none of them." Reeves testified that he only "[s]omewhat" looked at the man who was with the shooter, because his focus "was more [on] the person with the gun."

5. The calls are described in more detail *infra*.

6. Appellant also called a series of character witnesses, who testified that he had a reputation in the neighborhood for being "peaceful."

Earl Curley, appellant's close friend, testified that he heard gunshots coming from the area by the alley and that he had a "peripheral" view of appellant running toward him as the shots were fired, although he did not see appellant's hands. Curley testified that he did not believe appellant was the shooter because "then [there] would have been some bullet holes in his car, and, who knows who else he would have shot because he would have been running, I guess, looking away from where he was shooting because he's running." [7] Curley and his brother ran from the house to Minnesota Avenue, and he assumed appellant also ran in that direction because "when [he] saw [appellant] coming in [his] peripheral [vision,] that's the way he was running."

## II.

Before trial, appellant moved to suppress evidence of the cell phone calls that he made while left alone in the police interview room. He contended that the calls were "unlawfully seized and intercepted" in violation of the Fourth Amendment and the District of Columbia wiretapping statute, D.C.Code § 23–541 *et seq.* At the suppression hearing, Detective Russell–Brown testified that appellant contacted her on September 11, 2007, to ask about his Cadillac Escalade, which the police had seized, and thereafter came voluntarily to the Homicide Office. When he arrived,

the detective met him and escorted him into an interview room. As shown by photographs of the interview room that the government introduced during the hearing, the room was equipped with two clearly visible camera pods that protruded from the ceiling. Having viewed the video recording and photographs of the room, the trial court observed that the camera pods looked like those that could be seen "in a department store, in a commercial establishment, [and] in a casino." The cameras began recording before appellant entered the interview room at 2:52 p.m., and continued recording until after appellant was arrested and escorted to another room for booking at about 8:19 p.m.

During the interview, appellant sat in a chair across from Detective Russell–Brown. The detective did not inform appellant that he was being recorded.[8] The video recording shows that, early in the interview, while both appellant and Detective Russell–Brown were in the interview room, appellant called his mother from his cell phone, and subsequently handed the phone to the detective so that she could speak to his mother. After she handed the phone back to appellant and he completed the call, Detective Russell–Brown told appellant that "we really shouldn't even have cell phones in here . . . with this equipment," pointing to polygraph equipment that was located on a small table

---

7. On cross-examination, however, Curley admitted that he told the grand jury that he could not say that appellant was not the shooter.

8. A photograph of one of the two doors to the interview room, introduced at both the suppression hearing and at trial, shows that the door had a sign on it that refers to using the "VRS system as a backup" to another system "[w]hen conducting interviews." However, there is no discussion in the record about whether this is a reference to recording devices. Detective Russell–Brown testified at

the suppression hearing that the door in question was "an entrance door" to the interview room, and that the photograph, although "substantially show[ing] the appearance of the room as it appeared when [appellant] was taken or went into that room," was taken "[s]ometime later" than the interview. The record does not indicate whether the sign was on the door on the day of appellant's interview, and, in any event, it appears from the videotape that appellant entered the interview room through a different door.

next to her, and asked appellant to turn off his phone. About an hour later, the screen of the computer that was connected to the polygraph equipment spontaneously lit up, drawing appellant's attention. After Detective Russell–Brown asked appellant what he was looking at, she noticed that the equipment had come on and uttered, "Oh, Lord. What in the world?" Appellant, looking at the laptop, said "[r]ecording this?" Detective Russell–Brown answered "[n]o" as she continued to look at the computer. Appellant then said "[w]hat's that," and the detective explained that the computer was part of a polygraph system. She told appellant "[i]t's not yours" and asked him, "[Y]ou're not wired, are you? To the system?"[9] Detective Russell–Brown then resumed her interview of appellant. Appellant subsequently made the telephone calls at issue.

Appellant made the first of the calls at approximately 5:19 p.m., shortly after Detective Russell–Brown had described to appellant what she viewed to be the facts and the details of the shooting based on her investigation, including that appellant was the shooter. When Detective Russell–Brown stepped out of the interview room for a short period, appellant uttered, while placing a cup over his mouth, "They f\* \* \*ed me. They f\* \* \*ed me." Appellant then pulled out his cell phone, and very shortly thereafter placed it back in his pocket. The recording device picked up the sound of the cell phone turning on. Appellant looked up, directly at the cameras in the room, removed a baseball cap from his head, placed a call, leaned forward with the baseball cap covering his mouth, and stated, "[T]ell everybody they hip. These mother\* \* \*ers know every[ ]. When I say everything, everything."

At approximately 5:28 p.m., when appellant was again left alone in the interview room, he took off his baseball cap and placed his hand holding the cell phone inside the baseball cap. Again, the recording picked up the sound of the cell phone turning on. Eventually, appellant pulled the hat over his face and made a second call to someone whose voice was audible over speakerphone. The following exchange took place:

Unidentified: Hello?

Appellant: Tell everybody they know everything. I think Ray snitched.

Unidentified: Who?

Appellant: I think Ray snitched. They know everything.

Unidentified: (unintelligible)

Appellant: I think I'm about to get my ass locked up. Tell everybody they know everything. Bye.

During this call, just before appellant said that he thought he was about to be locked

---

9. At the suppression hearing, the parties told the court that they did not agree about whether Detective Russell–Brown's words were "To the System?" or "Through the system?." We have used appellant's interpretation in the text above.

Detective Russell–Brown denied trying to mislead appellant into thinking that he was not being recorded. She testified that appellant's "particular attention," as well as her own, "was simply on that device and it being a polygraph." She testified that it was her feeling that appellant "was concerned about being polygraphed, because he also showed some concern about the polygraph chair and not wanting to sit in the polygraph chair. So I was trying to relieve his feelings about the polygraph system altogether." Her comments about the polygraph chair appear to refer to appellant's having said, upon first entering the interview room, that he did not want to sit in the "comfortable chair" (that was alongside the polygraph equipment) because it "feel [sic] like The First 48 chair" (an apparent reference to the television show "First 48," which follows real-life homicide investigations and shows police interviews of criminal suspects).

up, he glanced directly at the cameras in the interview room.

Appellant made a third call at 6:57 p.m., after he had been placed under arrest and told he was not free to leave. During this conversation, appellant told the other party that he was about to go to jail, and that the police were "putting [him] as the shooter," that "somebody pointed [him] out as the shooter" and that he was "about to go to jail." Appellant also said (in an apparent reference to Charlie), "But the only thing they got Gutter as ... just going in the house with me." Appellant then said that he had "f\* \* \*ed up for good." Appellant did not cover the cell phone or his mouth when he made this call.[10]

In his motion to suppress, appellant argued that Detective Russell–Brown had "lulled [him] into thinking his conversations would be private and confidential" by informing him that their conversation was not being recorded. As a result, appellant argued, he had both a subjective and an objectively reasonable expectation of privacy in the interview room. He argued in addition that the phone calls qualified as "oral communications" under the wiretapping statute, and that the police unlawfully "intercepted" them. The trial court denied appellant's motion to suppress in a bench ruling, finding that appellant "knew that he was being recorded." In subsequently issued supplemental findings of fact and conclusions of law, the trial court found that the interaction between appellant and the detective regarding the polygraph machine was focused on that particular equipment, and "did not constitute an assurance that [appellant] enjoyed a private sanctuary for telephone calls."[11] The court also found that appellant did not exhibit an actual, subjective expectation of privacy, but "[i]n fact, his actions exhibited the contrary," demonstrating that he "obviously understood that he faced the prospect of surveillance" and "was openly trying to avoid it." The court further found that appellant "did not have a reasonable expectation of privacy that society is prepared to recognize," noting that "the unique function and nature of areas controlled by the police mean that courts generally do not recognize a legitimate expectation of privacy in such places."

With regard to the wiretapping statute, the court noted that an oral communication under the statute is defined as "any oral communication uttered by a person exhibiting an expectation that the communication is not subject to interception under circumstances justifying the expectation." D.C.Code § 23–541(2). The court found that appellant "did not exhibit an expectation that his calls were free from being the subject of interception," and that the circumstances would not have justified such an expectation. The trial court therefore concluded that there was no basis for suppressing the calls under either the Fourth Amendment or the wiretapping statute. Appellant argues that the court's rulings were in error, and asks us to reverse.

■ When reviewing the denial of a motion to suppress, we defer to the trial court's findings of fact, but we determine questions of law de novo. Patton v. United States, 633 A.2d 800, 814 (D.C.1993) (citations omitted). Further, "[w]e view the evidence presented at the suppression hearing in the light most favorable to the party prevailing below, and we draw all

10. The trial court required the government to show the jury the recording of the third phone call for purposes of "completeness."

11. The trial judge based this conclusion on what he saw and heard on the video recording and on the testimony of Detective Russell–Brown, which he found to be credible.

reasonable inferences in that party's favor," i.e., in favor of sustaining the trial court's ruling. *Womack v. United States,* 673 A.2d 603, 607 (D.C.1996) (citing *Peay v. United States,* 597 A.2d 1318, 1320 (D.C. 1991) (en banc)) (other citations omitted); *Stanley v. United States,* 6 A.3d 270, 273 (D.C.2010). Our role is limited "to ensur[ing] that the trial court had a substantial basis for concluding that no constitutional violation occurred." (Kenneth) *Dickerson v. United States,* 677 A.2d 509, 512 (D.C.1996) (citation omitted); *Brown v. United States,* 590 A.2d 1008, 1020 (D.C. 1991).

▆▆▆ The touchstone of Fourth Amendment right-to-privacy analysis "is whether a person has a 'constitutionally protected reasonable expectation of privacy.'" *California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) (quoting *Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). Central to the analysis is whether the person invoking the Fourth Amendment's protection "can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) (citations omitted). To establish a Fourth Amendment violation, "there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Katz,*

389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring). Because the District of Columbia wiretapping statute is "virtually identical" to the federal wiretapping statute, which was intended to codify the Fourth Amendment test established by the Supreme Court in *Katz,* the same analysis is required to determine whether an act of electronic surveillance runs afoul of it. *See Khaalis v. United States,* 408 A.2d 313, 340–41 (D.C.1979).

As evidence that warranted a finding that he had an actual, subjective expectation of privacy in the police interview room, appellant cites the "great lengths" he went to in order to hide his cell phone from the view of the surveillance cameras and his having "spoke[n] at a regular volume." These, he contends, show that he did not believe there was sound recording in the interview room and that he was "concerned [only] with visual monitoring." The government, by contrast, argues that appellant "attempt[ed] to muffle his voice with his cap," a "clear indication that he suspected he might be overheard," and thus did not have a subjective expectation of privacy. The government also urges that appellant's having underestimated the capability of the recording equipment that was in plain view was not the same thing as believing he had privacy.[12]

▆▆▆ We think the government has the better of the argument. First, we accord "considerable deference" to, and discern no error in the trial court's factual infer-

<hr/>

**12.** The government asserts that Metropolitan Police Department General Order 304.16 requires the police to record interviews in their entirety, from the time a subject first enters the interview room until the subject leaves the interview room. However, that Order applies to custodial interrogations, and as the trial court found, appellant was not in custody at the time of the first two telephone calls. *See* "Electronic Recording of Custodial Interrogations," M.P.D. General Order 304.16 (Feb. 2,

2006) (noting that police have "the responsibility to electronically record interrogations for all crimes described in this directive for those who have been arrested, or whose freedom of movement has been restrained to the degree associated with a formal arrest"). Thus, even if we posit that appellant knew about General Order 304.16, that alone would not undermine his argument that he did not know that there was pre-arrest sound recording in the interview room.

ence that appellant "obviously understood that he faced the prospect of surveillance" and "was openly trying to avoid it." [13] *Davis v. United States*, 564 A.2d 31, 35 (D.C.1989) (en banc); *see also Dow Chem. Co. v. United States*, 476 U.S. 227, 231, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986) (referring to a district court's determination of subjective expectations as a "factual finding"). Second, the precautions that appellant took to hide his cell phone and to hide his face (in his baseball cap) as he was speaking weigh heavily against (if they do not foreclose entirely) a conclusion that he understood and expected that he had privacy in the interview room. *See United States v. Harrelson*, 754 F.2d 1153, 1169–70 (5th Cir.1985) (observing that "the precautions taken to prevent eavesdropping show the [defendant and his wife] to have been aware of the possibility of it," and reasoning that "[m]istaking the degree of intrusion of which probable eavesdroppers are capable is not at all the same thing as believing there are no eavesdroppers"). Third, for there to be a Fourth Amendment violation, the individual must have "manifested a subjective expectation of privacy." *Kyllo v. United States*, 533 U.S. 27, 33, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (citation and internal quotation marks omitted). Having readily offered and agreed to turn off his cell phone when Detective–Russell Brown told him that cell phones should not be used in the interview room, appellant did not manifest to the detective that, thereafter, he expected to be able to make private phone calls when left alone in the room. Thus, by his manifest conduct, appellant did not alert the detective that she should turn off any recording device, or that she should not listen to the portion of any recording made,[14] while appellant was alone in the interrogation room. The record leaves little room for doubt that appellant *wished* for privacy, but that is not the same thing as having or exhibiting an actual expectation of privacy in the interview room.

■ Even if we assume, however, as appellant urges, that he manifested a subjective expectation of privacy as to sound (though not sight) as he made his phone calls in the interview room,[15] we still would not grant appellant the relief he seeks, because we agree with the trial court's legal conclusion that appellant did not have an objectively reasonable expectation of sound privacy. To begin with, courts have held that individuals do not typically have a reasonable expectation of privacy in police interview rooms. *Cf. Belmer v. Commonwealth*, 36 Va.App. 448, 553 S.E.2d 123, 126–28 (2001) (noting that a police interrogation room is not a "sanctuary for private discussions") (citation and internal quotation marks omitted); *State v. Owens*, 643 N.W.2d 735, 753 (S.D.2002) (finding no reasonable expectation of privacy in phone calls made from the interrogation room of a police station). Appellant acknowledges these holdings, but urges that his expectation of privacy was reasonable and must be recognized as such because Detective Rus-

---

13. We took the same impression upon reviewing the video recording ourselves, and would reach the same conclusion even if our role were to decide the issue *de novo.*

14. Detective Russell–Brown testified that it was not until she reviewed the videos a day or two after her interview of appellant that she saw that he had made phone calls while alone in the interview room.

15. *Cf. Katz*, 389 U.S. at 352, 88 S.Ct. 507 ("[W]hat [Katz] sought to exclude when he entered the [telephone] booth was not the intruding eye—it was the uninvited ear. He did not shed his right to do so simply because he made his calls from a place where he might be seen.").

sell–Brown "lulled" him into believing that his activities were not being recorded.

■■■■ Whether circumstances would have given rise to a legitimate or objectively reasonable expectation of privacy is a mixed question of law and fact that we review *de novo*. *United States v. Cooper*, 203 F.3d 1279, 1284 (11th Cir.2000). The answer depends on whether "a reasonable person would have privacy expectations" under the given circumstances. *Dow Chemical Co. v. United States*, 749 F.2d 307, 313 (6th Cir.1984). We agree with the trial court that a reasonable person in appellant's circumstances would have understood appellant's question to Detective Russell–Brown, as they both were looking at the polygraph equipment, to be a question about whether the detective was using that machine to record the interview; and would have understood the detective's response—"no," as she pointed to the fact that appellant was not wired to the equipment—to mean only that the equipment that caught appellant's attention, and at which he and the detective were looking, was not being used to record what was happening in the room. Stated differently, given the circumstances, a reasonable person would not have taken Detective Russell–Brown's statement as an assurance that no other recording device was in operation in the room, or, more specifically, that telephone calls could be placed from there in private. Those circumstances included the presence of two clearly visible camera pods mounted on the ceiling, about which appellant asked no questions;[16] the fact that neither appellant nor Detective Russell–Brown looked toward the camera pods when appellant asked about recording; the fact that appellant never inquired about or sought assurances of privacy in the interview room and did not ask for privacy in order to make a phone call; the fact that Detective Russell–Brown *twice* told appellant that he should not use his cell phone in the interview room;[17] and

---

**16.** The trial court found that appellant "was not asking about, nor was he given, assurances about the visible camera pods in the room or surveillance generally."

**17.** As already noted, Detective Russell–Brown asked appellant to turn off his phone early during the interview, and when he later asked whether he could use it to place another call to his mother, she reminded him, "I told you about—not up here." Nevertheless, a few minutes later, appellant placed the second of his recorded phone calls.

This case is unlike the cases on which appellant heavily relies: *State v. Munn*, 56 S.W.3d 486, 495–96 (Tenn.2001) (holding that "the defendant had a subjective expectation of privacy in his conversations" and that "the expectation of privacy was reasonable and justified," where police officers "asked the defendant and his mother if they would like to talk alone" and, "[a]fter the defendant agreed that he would like to be alone with his mother, the officers left the room and closed the door"); *People v. Hammons*, 235 Cal. App.3d 1710, 5 Cal.Rptr.2d 317, 319, 320 (1991) (holding that trial court erred in refus-

ing to suppress the evidence of conversation between defendants in pre-arraignment interview room after detective told defendants that they could talk "by yourselves" and "led them to believe that this was in fact a private conversation between just the 2 of you," conduct that "created an expectation of privacy in a setting where ordinarily such an expectation would be unreasonable"); and *North v. Superior Court of Riverside County*, 8 Cal.3d 301, 311–12, 104 Cal.Rptr. 833, 502 P.2d 1305 (Cal.1972) (holding that there was a "sufficient showing by petitioner to establish a reasonable expectation of privacy" where evidence was that detective surrendered to defendant and his wife the detective's own private office to enable them to converse and then exited and shut the door, leaving them entirely alone). *Cf. Belmer*, 553 S.E.2d at 129 (explaining that where "the only 'lulling' done by the detective was leaving appellant with his mother and her boyfriend," appellant "did not ask to speak privately with his mother," and the detective "did not tell them to feel free to discuss the incident privately" but "simply left them alone in the room," the court "c[ould not] find as a matter of law that

the fact that Police Department staff could, and, as shown on the video recording, did, enter the interview room unannounced through a door that had no window that would have allowed appellant to see who or what might be on the other side of the door.

In short, we sustain the trial court's ruling that appellant had neither a subjective nor an objectively reasonable expectation of privacy in the interview room. As the two prongs of the *Katz* test were not met, the trial court did not err in denying appellant's motion to suppress the statements he made during the cell phone calls he placed while left alone in that room.

### III.

 We turn now to appellant's insufficiency claim. In reviewing a claim that the evidence was not sufficient to sustain a conviction, we examine the evidence in the light most favorable to the government, *Hammon v. United States*, 695 A.2d 97, 107 (D.C.1997), recognizing "the province of the trier of fact to weigh the evidence, determine the credibility of the witnesses and to draw reasonable inferences from the testimony." (Bartrand) *Dickerson v. United States*, 650 A.2d 680,

683 (D.C.1994). We "will not reverse a conviction for insufficient evidence unless there is no evidence from which a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *Baker v. United States*, 867 A.2d 988, 1006 (D.C.2005) (citation and internal quotation marks omitted). The evidence need not "compel a finding of guilt beyond a reasonable doubt," and it need not "negate every possible inference of innocence." *Timberlake v. United States*, 758 A.2d 978, 980 (D.C. 2000).

 Appellant contends that the government did not adduce enough evidence to prove beyond a reasonable doubt that appellant was "the person who actually shot and killed" Carter. There was, appellant charges, a "disconnect between the evidence adduced and the theory of prosecution," since the evidence, including the government's own evidence, was "nearly overwhelming" that Charlie, not appellant, was the shooter. Therefore, according to appellant, "no reasonable juror could even find it highly probable that [appellant] shot and killed Leon Carter— much less find [appellant] guilty beyond a reasonable doubt." [18]

---

appellant's expectation of privacy was reasonable.").

18. Appellant acknowledges that the government did "muster[] a certain quantum of proof that [appellant] may have aided and abetted in the murder," but emphasizes that the government did not pursue an aiding and abetting theory at trial and that the jury did not receive an aiding and abetting instruction. Therefore, appellant contends, even if the evidence was sufficient for the jury to find that appellant aided and abetted Carter's murder (though not himself pulling the trigger), the absence of an aiding and abetting instruction means that appellant's murder and PFCV convictions cannot stand. In the Rule 28(k) letter that he filed to address the "proper evaluation of evidentiary sufficiency claims where the jury was not instructed on a partic-

ular theory of liability," appellant cites several cases from other jurisdictions holding that "[b]ecause no aiding and abetting instruction was given to the jury, [defendant's] substantive offense conviction cannot rest on that basis." *United States v. Basey*, 816 F.2d 980 (5th Cir.1987); *see also United States v. Medina*, 755 F.2d 1269, 1279 (7th Cir.1985); *United States v. Martin*, 747 F.2d 1404, 1407 (11th Cir.1984); *United States v. Wilson*, 657 F.2d 755, 763 (5th Cir.1981). It is far from certain, however, that the holdings in these cases survive the Supreme Court's decision in *Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).

In *Neder*, the Supreme Court upheld a conviction for tax fraud even though the trial court's instruction to the jury erroneously omitted the "materiality" element of the of-

■ We agree with appellant that there were a number of contradictions in the evidence that doubtless caused the jury to weigh how much credence could be given to the testimony of the government's witnesses. For example, as appellant points out, government witness Brooks repeatedly denied (to police and to appellant's cousin) knowing anything about the shooting, until the police threatened to take his car away and to charge him with obstruction of justice; and, when Brooks finally did talk to the police, he gave an account that was missing many of the details that he gave in his testimony before the grand jury and in his trial testimony. Government witness Reeves initially told Tindle that someone else (the man on foot in the alley near Reeves's house) was the shooter and that there was a second gunman, claims he later admitted were untrue. Nevertheless, we have little trouble concluding that the evidence as a whole was sufficient to allow a rational jury to find that appellant shot Carter, even if the evidence did not compel that conclusion.[19]

fense, because the record evidence could not have "rationally [led] to a contrary finding with respect to the omitted element." *Id.* at 19, 119 S.Ct. 1827. Relying on *Neder*, the court in *United States v. Abozid*, 257 F.3d 191, 199 (2d Cir.2001), held that even though "the district court mistakenly declined to charge the jury on an aiding and abetting theory," and even though the defendant's actions (using his access as a travel agent to create valid airline tickets, sell them to customers, and pocket the cash, without reimbursing the airlines) "did not constitute the crime" of "obtaining" the tickets with the intent to defraud, the court's failure to give the aiding and abetting instruction was harmless, and defendant's conviction would stand, where "he aided and abetted the crime committed by his purchasers, acts that under federal law rendered him punishable as a principal." *Id.* at 199. The court reasoned:

> Here, the jury convicted appellant of the crime itself. It could hardly have reached that conclusion and have left any possibility that it would have acquitted appellant of aiding and abetting the crime. There is no element of aiding and abetting the crime that was not found by the jury, and no defense that was not rejected by it. Aiding and abetting instructions do not provide a defense. Rather, they provide an additional theory of guilt. The error was therefore entirely harmless.

*Id.* at 199–200. Similarly, here, without having heard an aiding and abetting instruction, the jury convicted appellant of the first-degree murder of Carter and of PFCV and CPWL. The jury "could hardly have reached that conclusion and left any possibility that it would have acquitted appellant of aiding and abetting" those crimes, *Abozid*, 257 F.3d at 199, if it had been instructed that it could find appellant guilty upon concluding that he aided and abetted another person—Charlie or "Gutter"—to commit the crimes. Unlike in the (somewhat analogous) failure-to-instruct cases from this jurisdiction on which appellant also relies (*Bolanos v. United States*, 938 A.2d 672, 682 (D.C.2007), and *McGee v. United States*, 533 A.2d 1268, 1270–71 (D.C. 1987)), it would seem that the jury here made all the findings that would have been necessary to convict under the omitted instruction (i.e., that he " 'knowingly' associated himself with the commission of [the] crime, participated in the crime as something that he 'wished to bring about,' and 'intended by his actions to make it succeed,' " *Fox v. United States*, 11 A.3d 1282, 1288 (D.C.2011)).

In any event, because we are satisfied that the evidence was sufficient to sustain appellant's conviction as the shooter, we need not decide in this case whether a conviction may be sustained under an aiding and abetting theory where no aiding and abetting instruction was given.

19. As we have frequently observed, "[a] certain amount of inconsistency in the evidence is almost inevitable at any trial, but it rarely justifies reversal." *In re A.H.B.*, 491 A.2d 490, 495 (D.C.1985); *see also United States v. Jackson*, 579 F.2d 553, 558 (10th Cir.1978) ("Evidence is not necessarily insufficient merely because the witness' testimony has been contradictory and the explanations therefor difficult of belief"); *United States v. Tropiano*, 418 F.2d 1069, 1074 (2d Cir.1969) ("A witness may be inaccurate, contradictory and even untruthful in some respects and yet

Reeves, who was sitting next to Carter when he was shot, testified that he had a clear and unobstructed view of the shooter as he approached the green car and fired, and, within days of the shooting, he identified appellant from his photograph as the shooter without any hesitation or equivocation. Reeves's photo identification and later in-court identification of appellant was corroborated by Brooks, appellant's close friend for many years, who saw appellant with a gun just prior to, and just after, the shooting. Like Reeves, Brooks testified that two men, whom Brooks identified as appellant and Charlie, ran into the house and then came back out just before the shooting. Brooks and Reeves, who did not know each other, both identified the same type of gun from a photo array of guns that they viewed separately.

 Furthermore, there was strong circumstantial evidence that appellant was the shooter.[20] Appellant fled the scene moments after the shooting, and shortly thereafter, approached Brooks, hugged him, and apologized—conduct from which the jury could reasonably have inferred appellant's consciousness of guilt. Telephone records corroborated Brooks's testimony that appellant called him repeatedly after the shooting, expressing concern about whether the police had gone to his house and telling Brooks that they were "supposed to be brothers." The jury could reasonably have inferred that appellant was worried that Brooks would talk to the police and tell them what Brooks ultimately did tell them—that appellant carried the gun both before and after the shooting.[21]

The telephone calls, in which appellant said that the police "know everything," further provide evidence of appellant's guilt. Although appellant argues that at the point the first phone call was made, the detective had not accused appellant of being the shooter, it is clear from the transcript that the detective believed appellant was the shooter and had made that clear to him. For example, when appellant stated "[t]hey think I'm the shooter?," Detective Russell–Brown responded, "[c]ome on … [w]hat do you think?" It was after that exchange that appellant told the first person he called that the police were "hip" and knew "everything." In the second call, appellant said that he thought "Ray snitched" and repeated that "[t]hey know everything." In the third call, after appellant had been arrested, appellant told "Butch" that the police had tagged him as "the shooter," and that he had "f* * *ed up for good." A jury could reasonably have found these statements to be both incriminating and powerfully corroborative of the eyewitness evidence about appellant's actions.[22]

---

be entirely credible in the essential elements of his testimony.").

**20.** "[C]ircumstantial evidence may be equally as probative as direct evidence." *Head v. United States*, 451 A.2d 615, 625 (D.C.1982). Thus, "the fact that the case may rest on circumstantial evidence is of little consequence if the evidence is such that it may reasonably convince the trier of fact beyond a reasonable doubt." *Chaconas v. United States*, 326 A.2d 792, 797 (D.C.1974).

**21.** Such an inference reasonably could have been bolstered by appellant's statement, in one of his phone calls, that he thought that "Ray" (Brooks) "snitched."

**22.** Defense counsel emphasized to the jury that, during the videotaped interview with Detective Russell–Brown, appellant told the detective, "I know I can tell you what … happened, and I can go home" and "[i]f I tell you the truth, it's going to make me a snitch." Defense counsel argued that appellant would not have made these statements about "going home" and being a "snitch" if the "truth" had been that he was the shooter. The inference that defense counsel urged the jury to draw might have been one reasonable interpretation, but the jury was not compelled to

Appellant asserts that Reeves's description of the shooter did not match Brooks's description of appellant, emphasizing that Reeves told Detective Russell–Brown that the shooter had a mustache, whereas Brooks did not mention appellant's having any facial hair, but described *Charlie* as having a mustache. Reeves stated that the shooter wore a white T-shirt, a black baseball cap and black Nike boots, while Brooks described appellant as wearing a red shirt, no hat, and white tennis shoes.[23] However, we think these descriptions are more notable for their similarity than for this dissimilarity. Reeves described the shooter as chubby, between 200 and 300 pounds, 5'8" to 5'9", 25 or 26 years old, dark-skinned, and with dreads, a light mustache, and a very short-trimmed beard. Brooks described appellant as about 300 pounds, 5'7", 23 to 24 years old, brown complexion, and with his hair in plaits. In any event, the discrepancies were for the jury to resolve. In concluding that appellant was the shooter, they could reasonably have taken into account the chaotic and stressful nature of the murder scene, among other factors, as explaining inaccuracies and discrepancies in the descriptions of the shooter. *Cf. United States v. Bamiduro*, 718 A.2d 547, 551 (D.C.1998) ("Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.").

Appellant argues that the "most troubling" aspect of the government's case was that Reeves testified that the shooter fled in one direction (the direction in which the evidence showed Charlie fled), and that Brooks testified that appellant fled in the opposite direction—a discrepancy that the prosecutor conceded in his closing argument. However, there was evidence that David Arrington, who weighed about the same as appellant, had come out of a nearby house at about the time of the shooting, had started walking toward appellant's house, and was in the middle of the street when the shots were fired. The government argued to the jury that it was possible that Arrington ran in the same direction as Charlie and that, in the chaotic aftermath of the shooting, Reeves mistook Arrington for appellant. As the government points out, Reeves was not confident in his assessment of which way the shooter fled, stating that by that time he "was focused on" the victim Carter, that he saw people "scatter," and that the shooter "might [have] turned the corner [in] another direction, but [he] wasn't sure." Once again, it was the jury's prerogative to accept or reject those or other possible explanations for the discrepancies and to decide what evidence to credit.[24]

Finally, we address the other evidence that appellant argues rendered the evidence "nearly overwhelming" that Charlie rather than appellant was the person who killed Carter: Brooks's testimony that appellant, as he was running toward the house after gunshots were heard, said "Gutter hit my car." According to appel-

---

draw that inference or to accept appellant's statements as ingenuous.

**23.** There also were discrepancies in Reeves's and Brooks's descriptions of the second man (Charlie). Reeves said that the second man had long dreads and was clean shaven; Brooks said that Charlie had low-cut hair and a small mustache. But both described the man as being about 5'5" and possibly in his

late teens (Reeves said 16–17 years old, Brooks said 19–20 years old).

**24.** Jury notes show that the jury was focused on the details of the discrepancies in the testimony. One jury note asked when Reeves was able to see the shooter wearing Nike boots. In another note, the jury asked to see photographs of Charlie Smith and David Arrington.

lant, "the only reasonable inference to draw" from this statement was that Charlie (aka "Gutter") "caused the car accident by shooting Mr. Carter." However, the jury could have drawn a different reasonable inference: e.g., that Brooks misremembered what he heard; or that Brooks did not hear clearly each word of appellant's statement, and that appellant was speaking to Charlie to alert him that appellant's car had been hit, saying something like "Gutter, they [Carter and Reeves] hit my car"; or, perhaps, that appellant was seeking falsely to cast Charlie as the shooter by telling Brooks that "Gutter hit [appellant's] car" while shooting at the occupants of the green car. We obviously cannot know how the jury regarded the "Gutter hit my car" testimony, but we are satisfied that neither by itself nor in combination with the other evidence did it compel the jury to find that Charlie rather than appellant was the shooter. No direct evidence was presented to indicate that Charlie had a gun, and appellant was the only one whom eyewitnesses at the scene (Reeves and Brooks) saw with a gun. In short, we cannot agree that the evidence that Charlie killed Carter was "overwhelming," such that reasonable jurors could not have found appellant guilty beyond a reasonable doubt.

During their deliberations, the jury had all the information appellant relies upon to argue that the evidence was insufficient. Reeves and Brooks were thoroughly cross-examined regarding their inconsistent statements, and the jury had the opportunity to hear the differences fully explored and to view the witnesses' demeanor on the stand and to assess their credibility during several days of testimony. It was up to the jury to decide whether to believe Reeves and Brooks, and they "weigh[ed] the evidence, determine[d] the credibility of the witnesses and ... dr[ew] reasonable inferences from the testimony" in such a way that they convicted appellant. (Bartrand) *Dickerson*, 650 A.2d at 683. Ultimately, we agree with the government that appellant's insufficiency claim amounts to an invitation to this court to overturn the jury's credibility determinations—something we may not do.

Wherefore, the judgment of conviction is

*Affirmed.*