# District of Columbia
# Court of Appeals

**Nos 15-CF-215 and 15-CF-232**

FLOYD K. LONG & ALONZO J. FERRELL,

Appellants,

v.        <strong>CF3-21886-12 & CF3-21887-12</strong>

UNITED STATES,

Appellee.



March 30, 2017

DISTRICT OF COLUMBIA
COURT OF APPEALS

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE: BECKWITH and MCLEESE, *Associate Judges*, and KRAVITZ, *Associate Judge, Superior Court of the District of Columbia.* [*]

## J U D G M E N T

This case came to be heard on the transcripts of record, the briefs filed, and was argued by counsel. On consideration whereof, and for the reasons set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that for the foregoing reasons, the case is remanded to the Superior Court for the limited purposes of (1) vacating appellants' convictions for felony receiving stolen property and entering, in their place, convictions for misdemeanor receiving stolen property, with resentencing as appropriate; and (2) vacating Mr. Long's merged conviction for reckless driving, The judgments of the Superior Court are otherwise affirmed.

For the Court:

*Julio A. Castillo*

JULIO A. CASTILLO
Clerk of the Court

Dated: March 30, 2017

Opinion by Associate Judge Neal A. Kravitz

---

[*] Sitting by designation pursuant to D.C. Code § 11-707 (a) (2012 Repl.).

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 15-CF-215 and 15-CF-232

FLOYD K. LONG AND ALONZO J. FERRELL, APPELLANTS,

V.

UNITED STATES, APPELLEE.

FILED 03/30/2017
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeals from the Superior Court
of the District of Columbia
(CF3-21886-12 and CF3-21887-12)

(Hon. John McCabe, Trial Judge)

(Argued January 18, 2017                    Decided March 30, 2017)

*Nancy E. Allen* for appellant Floyd K. Long.

*Thomas D. Engle*, with whom *Sharon L. Burka* was on the brief, for appellant Alonzo J. Ferrell.

*Daniel J. Lenerz*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney, and *Elizabeth Trosman*, *Chrisellen R. Kolb*, and *Demian Ahn*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH and MCLEESE, *Associate Judges*, and KRAVITZ, *Associate Judge, Superior Court of the District of Columbia.*[*]

---

[*]  Sitting by designation pursuant to D.C. Code § 11-707 (a) (2012 Repl.).

KRAVITZ, *Associate Judge*:  A Superior Court jury found appellants Floyd K. Long and Alonzo J. Ferrell guilty of conspiracy, armed robbery, and other offenses arising from a series of street robberies committed by masked gunmen operating out of a stolen Dodge Intrepid late on Christmas Eve 2012.  Appellants argue that the trial judge erred by failing to suppress a show-up identification of Mr. Long made by one of the robbery victims and by allowing the government to prove appellants' familial relationships with a third man identified as a potential match for DNA found inside the Intrepid.  Appellants also challenge the sufficiency of the evidence supporting their convictions for unauthorized use of a motor vehicle and felony receiving stolen property.

We conclude that the evidence of the value of the Intrepid was insufficient to sustain appellants' convictions for felony receiving stolen property, and we will remand for the entry of convictions on the lesser-included offense of misdemeanor receiving stolen property.  We otherwise find no reversible error.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Michael Richards drove home from a Christmas Eve party late at night on December 24, 2012.  He parked his car in front of his house in the 200 block of

Hamilton Street, N.W. at approximately 11:15 p.m. and gathered his belongings to go inside.

Before he made it into his house, however, Mr. Richards realized he had left his iPad in his car, and he went back to retrieve it. As he reached into his car, he noticed a tan, four-door sedan pull up. Two men got out of the sedan. One had a ski mask covering his face and a .38 caliber revolver in his left hand. The man pointed the revolver at Mr. Richards and said, "[G]ive it up, you know what time it is." Mr. Richards raised his hands. The other man then searched Mr. Richards from behind, taking his wallet, keys, and iPhone, while the man with the revolver took the iPad. Mr. Richards asked the men to leave his keys and wallet, and they did, after ensuring there was no money in the wallet. The men kept the iPhone and iPad, however, and took them back to the sedan, which immediately drove off.

Unable to call the police without a cell phone, Mr. Richards got in his car and drove around looking for a police officer. He found one a few blocks away and reported the robbery, describing the robbers' vehicle as a tan, four-door sedan, possibly an Intrepid. The officer broadcast a lookout for the car over the police radio.

At approximately 11:30 p.m., Kurt Becker parked his car in the 100 block of Webster Street, N.E., where he planned to attend a Christmas Eve party at a friend's apartment. As soon as he turned off his ignition, Mr. Becker noticed three men run in front of his car. One was holding a pistol with a long black barrel; another had a shiny silver semi-automatic pistol with a short barrel. Mr. Becker looked away, hoping to avoid a confrontation.

Within seconds, however, Mr. Becker heard a metallic tapping on his car window. He turned and saw the man with the long-barreled pistol pointing the weapon directly at him. Mr. Becker opened his car door, and the man, wearing a black ski hat, with dreadlocks down to his shoulders, told Mr. Becker to give him all of his money. Mr. Becker took out his wallet and gave the man $160.00. The second gunman then told Mr. Becker to give him his license, phone, and car keys. Mr. Becker tried to comply but had trouble getting his license out of his wallet, and the man settled for his LG smartphone. All three men then got into a Dodge Intrepid parked across the street and drove off. Mr. Becker went to a nearby police station and reported the robbery.

Thomas Bartek, Jr. arrived home from work a few minutes after 11:30 p.m. He parked his car in front of his house in the 600 block of Jefferson Street, N.E. and walked around to the passenger side to get some items he had bought.

Mr. Bartek soon noticed a man walking toward him from the driver's side of a vehicle that had pulled up. The man was wearing a dark puffy jacket, baggy pants, and a ski mask with long dreadlocks sticking out of it. As the man approached, he pointed a black pistol at Mr. Bartek's face and said, "[M]erry Christmas. Give me your fucking money." Mr. Bartek reached into his pocket and gave the man three one-dollar bills. A second man, wearing a mask and armed with a silver semi-automatic pistol, then got out of the other car. The man held his gun to the back of Mr. Bartek's head while the first man searched Mr. Bartek's wallet and went through his pockets, finding a blue Samsung smartphone but no more money. A third masked man then got out of the other car and took Mr. Bartek's keys. The men went through Mr. Bartek's car but took nothing, and they returned to their vehicle with Mr. Bartek's blue Samsung phone and three one-dollar bills.

Mr. Bartek watched the robbers' car as it drove off and thought it was either a Dodge Intrepid or a Pontiac. He then went inside and called 911.

A few minutes after midnight, Francois Mitchell was loading Christmas gifts into his car in front of his parents' home in the 1700 block of Varnum Street, N.W. Mr. Mitchell watched as a car turned onto Varnum Street and drove slowly toward him. The car stopped a few feet away, and a man wearing a mask from the nose down got out of the car, pointed a black semi-automatic pistol at Mr. Mitchell, and stated, "[Y]our cash or your wallet."

Mr. Mitchell grabbed the gun and began to wrestle with the man. A second man then got out of the car and pointed another black semi-automatic pistol at Mr. Mitchell. The second man said, "[Y]our cash or your wallet" and reached into Mr. Mitchell's pocket and took his wallet. Two more men approached moments later, and Mr. Mitchell, realizing he was out-numbered, screamed for help.

The four men sped off in their car with Mr. Mitchell's wallet, but not before Mr. Mitchell memorized the car's license plate number. Mr. Mitchell ran inside and reported the robbery and the license plate number to a 911 dispatcher. It was 12:15 a.m.

The license plate number reported by Mr. Mitchell was assigned to a 2002 Dodge Intrepid owned by a woman named Brenda Holmes and reported stolen in the District of Columbia on December 23, 2012. The police entered the number into a license plate reader database, and at approximately 12:45 a.m., an announcement was broadcast over the police radio that the Intrepid, believed to be involved in a string of armed robberies, had just passed a license plate reader at the intersection of East Capitol Street and Texas Avenue, S.E.

Officers Ryan Devlin and Jonathan Lauderdale were nearby in a marked police cruiser. The officers drove in the direction of the license plate reader and saw the Intrepid coming toward them on Central Avenue. They made a U-turn to get behind the Intrepid and then activated their lights and siren in an attempt to make a traffic stop. The Intrepid, however, sped away from the officers and led them on a brief chase, crossing into Prince Georges County, Maryland, and then back into the District, where the car spun out of control and came to a rest facing sideways in the middle of 56th Street, S.E.

Four men got out of the Intrepid and fled up 56th Street. Officer Devlin ran after the driver, while Officer Lauderdale chased the front seat passenger. Officer Devlin quickly caught up to the driver, Mr. Long, in a stairwell two houses away

and took him into custody at approximately 12:50 a.m.  Mr. Long had shoulder-length dreadlocks and was wearing a puffy jacket.  A search of his clothing yielded a blue Samsung smartphone, $160.00 in cash, and a Cricket cell phone.  Officer Lauderdale detained the front seat passenger, Mr. Ferrell, a minute or two later after finding him lying on the wet ground behind a shed in a backyard, breathing heavily.  Beneath Mr. Ferrell was a pair of dry gloves, and found on his person were a black ski mask, a T-Mobile cell phone, and a total of $112.01 in U.S. currency, including three one-dollar bills balled up together.  In Mr. Ferrell's flight path, the police found a Sprint Kyocera cell phone registered to a person named Lakeisha Lesesne.  The other two occupants of the Intrepid were never apprehended or identified.

A report of the chase of the Intrepid and the arrests of Mr. Long and Mr. Ferrell was broadcast over the police radio.  Detective Christopher Baxa heard the broadcast while in the 600 block of Jefferson Street, N.E. investigating the robbery of Mr. Bartek.  He and Detective Eric Roche promptly drove Mr. Bartek in a police vehicle to the intersection of 56th Street and Central Avenue, S.E. for a show-up identification.  There, Mr. Bartek remained in the back seat of the police vehicle as Officer Devlin brought Mr. Long to an area in the street thirty-five to fifty feet away.  The area was illuminated by the lights of several police cars, and Mr. Long,

wearing his puffy jacket, was handcuffed behind his back. A second police officer might have been standing nearby. The Intrepid was on a different street, out of Mr. Bartek's line of sight.

Mr. Bartek said, "[T]hat's the driver," as soon as Mr. Long came into view. Detective Roche started to ask Mr. Bartek if he was sure of the identification, but Mr. Bartek cut him off and said, "Yes," before the detective was able to finish the question. It was 1:16 a.m., approximately thirty minutes after Mr. Long's arrest, and approximately an hour and forty-five minutes after the robbery of Mr. Bartek in the 600 block of Jefferson Street, N.E.

Several minutes later, detectives showed Mr. Bartek the blue Samsung Galaxy seized from Mr. Long. Mr. Bartek logged onto the phone and confirmed it was his. Detectives then took him to look at the Intrepid, and he identified it as the car used in the crime.

The police did not show Mr. Ferrell to Mr. Bartek or conduct any out-of-court identification procedures with the victims of any of the other robberies.

The police did search the Intrepid, and they found Mr. Richards' iPad on the rear seat and a loaded .357 revolver, with a brown handle and black barrel, lying across the cup holder in the front center console. They also observed that the ignition had been punched and that there was a brick near the center console and a screwdriver on the floorboard in the front passenger area.

Crime scene officers photographed the interior and exterior of the Intrepid and recovered the .357 revolver and the iPad. They also swabbed the revolver and the steering wheel and inside handles of all four of the car's doors for DNA.

The government later sent the swabs from the revolver and the Intrepid to a laboratory for testing along with known DNA samples from Mr. Long and Mr. Ferrell. A forensic DNA analyst at the laboratory tested the items and determined that the swab from the steering wheel contained a mixture of DNA from at least three individuals. The analyst, Christiana Shoopman, determined further that an unknown male was the major contributor of the DNA recovered from the steering wheel and that neither Mr. Long nor Mr. Ferrell was the source of any of the DNA.

Ms. Shoopman reported similar results from her analysis of the other swabs taken from the Intrepid. The swabs from the inside door handles of the car

contained DNA from at least two individuals, and in each instance Mr. Long and Mr. Ferrell were excluded as possible contributors. Ms. Shoopman was unable to develop any DNA profile from the swab taken from the revolver.

A special agent of the Federal Bureau of Investigation analyzed cell phone records relating to the Cricket phone seized from Mr. Long, the T-Mobile phone found on Mr. Ferrell, and the Sprint Kyocera phone recovered from the ground in Mr. Ferrell's flight path. The agent, Jennifer Banks, determined that the Sprint Kyocera phone called Mr. Ferrell's T-Mobile phone at 10:16 p.m. on the night of the robberies and Mr. Long's Cricket phone a minute later. She also determined that one or more of the phones were in the general area of each of the robberies near the times of the offenses.

Mr. Long and Mr. Ferrell went to trial in October 2014 charged jointly with conspiracy, armed robbery (four counts), possession of a firearm during a crime of violence (four counts), possession of an unregistered firearm, unlawful possession of ammunition, unauthorized use of a motor vehicle during a crime of violence, and felony receiving stolen property. Mr. Long faced additional charges of unlawful possession of a firearm by a convicted felon, felony fleeing, and reckless

driving. After a nearly three-week trial, the jury found both defendants guilty of all charges.

## II. DISCUSSION

### A. Show-Up Identification

Mr. Long moved before trial to suppress the show-up identification made by Mr. Bartek, arguing that the identification was the unreliable result of an unduly suggestive show-up procedure. The trial judge held an evidentiary hearing on the motion before the jury was selected. Officer Devlin and Detective Baxa appeared as witnesses for the government and testified to the facts set forth above relating to the show-up. Mr. Long presented no evidence, and neither side sought to call Mr. Bartek as a witness.

The trial judge denied the motion in an oral ruling. The judge credited the version of events provided by Officer Devlin and Detective Baxa and stated that the question before him was whether the show-up was "unduly suggestive and unreliable." Noting that "show-up identifications are, by their terms, more suggestive than . . . lineups or photo arrays," the judge stated further that this was

"a standard show-up" and that "it's obviously a very reliable identification" given the recovery of Mr. Bartek's phone from Mr. Long's person and the "very specific description" of the car used in the robbery. The judge made no other findings.

As indicated, Mr. Bartek did not testify at the pretrial hearing on the motion to suppress. He did appear as a witness for the government at trial, however, and he testified that a detective told him before the show-up that the police wanted to take him to a location where they believed they had stopped the people involved in the robbery. Despite this testimony, no party asked the trial judge to revisit his pretrial ruling on the motion to suppress, and there was no additional discussion of the motion or the suggestivity of the show-up procedure.

Mr. Long and Mr. Ferrell argue to this court that the trial judge committed reversible error in denying the motion to suppress the show-up identification. They contend that the show-up was conducted in an impermissibly suggestive manner, given the statement allegedly made to Mr. Bartek before the identification,[1] the circumstances of the procedure itself, and the passage of an

---

[1] One court has held that a defendant's failure to renew a pretrial motion to suppress based on evidence presented during trial precludes the defendant's reliance on the new evidence on appeal. *See United States v. Hicks*, 978 F.2d 722, 724 (D.C. Cir. 1993) ("The problem for Hicks is that he did not again move to

(continued…)

hour and forty-five minutes between the robbery and the identification. They contend further that the identification was unreliable and that the trial judge failed to make sufficient findings on either the suggestivity of the show-up procedure or the reliability of the identification.

We agree that the trial judge's findings on suggestivity and reliability were deficient. For the reasons that follow, however, we find no basis for reversal.

To prevail on a motion to suppress an out-of-court identification on due process grounds, a defendant must prove, as an initial matter, that the procedure resulting in the identification was "'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Neil v. Biggers*, 409 U.S. 188, 197 (1972) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). If the defendant satisfies this burden, then the government may avoid suppression only by establishing that the identification was nonetheless reliable viewed in the totality of the circumstances. *Kaliku v. United States*, 994 A.2d 765,

---

(…continued)
suppress when this evidence came to light at trial. An appellate court should not rely on evidence first produced at trial to reverse a pre-trial denial of a suppression motion not renewed at trial."). We need not decide this question given our conclusion that consideration of the statement allegedly made to Mr. Bartek does not alter the outcome of our analysis.

781-82 (D.C. 2010). Reliability, therefore, is "the linchpin" of admissibility, *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977), and factors to be considered in determining the reliability of an identification include (1) the witness's opportunity to observe the perpetrator at the time of the crime, (2) the degree of attention the witness paid to the perpetrator, (3) the accuracy of any prior descriptions of the perpetrator provided by the witness, (4) the level of certainty demonstrated by the witness at the time of the identification, and (5) the lapse in time between the crime and the identification procedure. *Biggers*, 409 U.S. at 199-200. "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Manson*, 432 U.S. at 114.

A trial judge ruling on a motion to suppress an out-of-court identification must make an express "yes or no" determination on the question whether the procedure was impermissibly suggestive. *United States v. Brown*, 700 A.2d 760, 762 (D.C. 1997). The judge in this case, however, stated only that the procedure leading to Mr. Bartek's identification of Mr. Long was "a standard show-up." The judge did not say whether the show-up was impermissibly suggestive, and he made no findings on any subsidiary facts relevant to the suggestivity inquiry. The judge's characterization of the show-up as "standard" may have been meant to

suggest the absence of any undue suggestivity, but even if the judge's remark was so intended, it was not the type of express finding required by our case law.[2]

The trial judge's finding on reliability was equally inconsistent with the requirements of governing law, albeit for different reasons. A judge determining the reliability of an identification must consider all relevant factors, including those specifically identified in *Biggers*. *See Henderson v. United States*, 527 A.2d 1262, 1268-69 (D.C. 1987). Notably, however, the reliability inquiry may not include the consideration of evidence of the defendant's guilt external to the identification, such as the defendant's possession of the proceeds or instrumentalities of the crime. The Supreme Court made clear in *Manson* that corroborative evidence external to an identification "plays no part" in the due process analysis of the reliability of the identification. 432 U.S. at 116. *See also id.* at 118 (Stevens, J.,

---

[2] Under a recent amendment to Rule 12 (c) of the Superior Court Rules of Criminal Procedure, adopted after the trial in this case, a trial judge ruling on a motion in a criminal case "involving factual issues" must "state [his or her] essential findings on the record." This means that in addition to an express "yes or no" finding on undue suggestivity, a judge ruling on a motion to suppress an out-of-court identification must make explicit findings of fact on all subsidiary issues material to the suggestivity of the identification procedure, including the circumstances in which the procedure was conducted and any comments made by law enforcement officials to the witness participating in the procedure. Together, the required findings reflect the judge's consideration of the evidence and enable our role of deciding whether the judge's ruling was supported by the evidence and in accordance with the law. *See Howard v. United States*, 954 A.2d 415, 423 (D.C. 2008).

concurring) ("[I]n evaluating the admissibility of particular identification testimony it is sometimes difficult to put other evidence of guilt entirely to one side. Mr. Justice Blackmun's opinion for the Court carefully avoids this pitfall and correctly relies only on appropriate indicia of the reliability of the identification itself.") (footnote omitted). As the Second Circuit explained, the reliability inquiry "differs from the inquiry into the trustworthiness of the verdict. For example, even where there was irrefutable evidence of the defendant's guilt, if an identification were made by a witness who, it transpired, was not even present at the event, we could hardly term the identification reliable." *Abdur Raheem v. Kelly*, 257 F.3d 122, 140 (2d Cir. 2001). Put another way, the fact that an identification is proved accurate by evidence unrelated to the identification itself does not mean the identification is reliable within the meaning of a proper due process analysis.

The trial judge here failed to address any of the *Biggers* factors. He said nothing about Mr. Bartek's opportunity to observe the man who approached him from the driver's side of the Intrepid, the degree of attention Mr. Bartek paid to the man during the incident, the accuracy of Mr. Bartek's prior descriptions of the man (as opposed to the Intrepid), the level of certainty Mr. Bartek exhibited at the show-up, or the passage of an hour and forty-five minutes between the robbery and the identification procedure. Instead, the judge relied solely on forbidden

inferences arising from Mr. Long's presence inside the Intrepid, his possession of Mr. Bartek's cell phone, and the reported involvement of the Intrepid in the robberies.

We nonetheless conclude that the shortcomings in the trial judge's findings do not require reversal or even a remand. This court may affirm the denial of a motion to suppress identification if, as here, "we are satisfied that, taking all of the identification evidence in the light most favorable to [the defendants], there can be only one result: no undue suggestivity as a matter of law." *Brown*, 700 A.2d at 762.

It is inherently suggestive for police to present a single suspect in custody to a witness at a show-up. *Howard*, 954 A.2d at 423. We have long acknowledged, however, that "a prompt show-up identification 'enhances . . . reliability' and serves a purpose to 'exonerate an innocent person who has been mistakenly apprehended.'" *Maddox v. United States*, 745 A.2d 284, 292 (D.C. 2000) (quoting *United States v. Hunter*, 692 A.2d 1370, 1375 (D.C. 1997)). Some significant "coercion or intolerable suggestivity" – *i.e.*, something "more egregious than mere custodial status" – therefore must be shown to prove the "special elements of unfairness" required to establish undue suggestivity in a show-up identification.

*Brown*, 700 A.2d at 763; *Singletary v. United States*, 383 A.2d 1064, 1068 (D.C. 1978). We have held repeatedly, in this regard, that it is not necessarily unduly suggestive for a single suspect to be exhibited to a witness in handcuffs, illuminated by the bright lights of police cruisers, and in the presence of (or even surrounded by) uniformed police officials. *See, e.g.*, *Kaliku*, 994 A.2d at 782; *Howard*, 954 A.2d at 423; *Diggs v. United States*, 906 A.2d 290, 300 (D.C. 2006).

Mr. Long and Mr. Ferrell argue that the requisite special element of unfairness occurred when one of the detectives told Mr. Bartek the police wanted to bring him to a location where they believed they had stopped the people involved in the robbery. This argument has some force, but it is foreclosed by our case law.

In *Diggs*, for example, we found no undue suggestivity where police told a witness that they had "caught" or "got" the perpetrators of a carjacking before showing the witness two suspects in handcuffs, surrounded by at least ten police officers and in view of the carjacked vehicle. 906 A.2d at 300-01. Similarly, in *Washington v. United States*, 334 A.2d 185, 186-87 (D.C. 1975), we found no impermissible suggestivity where a detective told a witness about to take part in a show-up that "we got your man, we think." And in *Singletary*, we found no undue

suggestivity where an officer told a victim of a robbery prior to a show-up that "[w]e got two guys in the car similar to the ones you told us about." 383 A.2d at 1068 (brackets and internal quotation marks omitted). We thus conclude, based on our precedents, that the statement the detective is alleged to have made to Mr. Bartek was not sufficiently egregious to render the show-up procedure impermissibly suggestive.[3]

Nor, in the circumstances, was it impermissibly suggestive for the police to conduct the show-up procedure an hour and forty-five minutes after the robbery. The lapse in time between a crime and an identification is one of the reliability factors enumerated in *Biggers* and is not typically viewed as a source of undue suggestivity. Even in the reliability context, however, it is "impossible to fix any precise time limit measured by a specific number of minutes from the commission of the crime within which all on-the-scene confrontations must take place," *Jones*

---

[3] We noted in *Singletary* that the detective's comment "could have been phrased more neutrally," 383 A.2d at 1068, and we reiterate that point here. The police should take great care to avoid saying anything in the presence of a witness to an offense that could be reasonably understood as suggesting a police officer's belief that a person the witness is about to view in an identification procedure is in fact the perpetrator of the offense. It may be that "[w]hatever the police actually say to the viewer, it must be apparent to him that they think they have caught the villain," *Russell v. United States*, 408 F.2d 1280, 1284 (D.C. Cir. 1969), but there is nothing legitimate to be gained by making explicit what is otherwise at most implied.

*v. United States*, 277 A.2d 95, 98 (D.C. 1971), and we have held that show-up identifications made an hour or more after the commission of a crime were not only permissible in the circumstances, but sufficiently prompt to add to the reliability of the identifications. *See, e.g.*, *Lyons v. United States*, 833 A.2d 481, 486 (D.C. 2003); *Brown*, 700 A.2d at 763. Indeed, in *Brown*, a case with particular resonance here, we held that a one-hour span between the crime and a show-up procedure posed no due process concern in part because the show-up was delayed and had to be moved due to "the suspects' conduct in fleeing the scene and leading the police on a chase throughout the entire metropolitan area." *Id*.

We thus conclude, as a matter of law, that the show-up procedure was not impermissibly suggestive. This conclusion ends our analysis on appeal without regard to the question of reliability, since a defendant's failure to establish undue suggestivity is fatal to his motion to suppress an identification on due process grounds. *See id.*; *Hunter*, 692 A.2d at 1376.[4]

---

[4] For a trial judge, on the other hand, a finding of no undue suggestivity ordinarily should not end the analysis. We have repeatedly encouraged trial judges to make findings on the reliability of identifications even when they have found the procedures resulting in those identifications not impermissibly suggestive. *See, e.g.*, *Kaliku*, 994 A.2d at 782; *Howard*, 954 A.2d at 423 n.5; *In re M.A.C.*, 761 A.2d 32, 42 n.7 (D.C. 2000). We encourage trial court findings on both prongs of the due process analysis because "in that occasional case where we disagree with the no [undue] suggestivity finding, or where that finding presents a close question,

(continued…)

## B. Evidence of Familial Relationships

Ms. Shoopman testified at trial as an expert in forensic DNA analysis. Toward the end of her direct examination, the prosecutor read the following stipulation to the jury regarding the DNA swab taken from the steering wheel of the Dodge Intrepid:

> The parties in this case, the United States [and] defendants Floyd Long and Alonzo Ferrell, hereby agree and stipulate that the DNA profile obtained from the major contributor of the swab obtained from the steering wheel, Item 12, was entered into the Combined DNA

---

(…continued)
the appeal can be resolved based on the outcome of the reliability determination without the need to remand for findings on that point." *Greenwood v. United States*, 659 A.2d 825, 828 (D.C. 1995).

We also reiterate that a trial judge who has found no undue suggestivity at a pretrial suppression hearing has discretion to defer making findings on reliability until the witness who made the identification has testified at trial. *See id.* at 829. This approach enables the judge to make the reliability findings based on a more complete and non-hearsay record, and it enhances our ability to review the judge's findings on appeal. The deferred-finding approach can be particularly valuable in cases, like this one, in which identification-related testimony presented at trial differs in material respects from the evidence received at the pretrial hearing. Had the trial judge in this case deferred his findings on reliability, he could have determined whether the pre-show-up statement attributed to the detective was actually made to Mr. Bartek and, if so, the extent to which, if at all, the statement affected the reliability of the ensuing identification.

Index System (CODIS) and that the Maryland State Police reported a CODIS match between the major contributor of the steering wheel and Cordell J. Lesesne with a date of birth of July 12, 1986.

Continuing her direct examination, Ms. Shoopman explained that CODIS is a database of DNA profiles and testing results maintained by the Federal Bureau of Investigation. She stated that certain federal, state, and local law enforcement agencies have access to CODIS and are able to compare unknown DNA samples and profiles with known samples and profiles in the database to determine whether cases might be connected. She emphasized, however, that a "CODIS match is just an investigative lead" that gives law enforcement "probable cause to go out and obtain a reference sample from [the] particular individual" possibly implicated by the match. Once a reference sample is obtained from the individual, she said, the sample "will be sent to the laboratory and a comparison will be made to determine if it is in fact a match or not."

The government subsequently announced its intention to prove that Cordell Lesesne was related to Mr. Long and Mr. Ferrell – specifically, that Mr. Lesesne was a half-brother of Mr. Ferrell and that Mr. Lesesne and Mr. Ferrell were both first cousins of Mr. Long. Appellants objected, and the trial judge entertained oral and written arguments on several different days. The government contended that

the CODIS match, though not conclusive, was probative evidence of Mr. Lesesne's presence inside the Intrepid and that Mr. Lesesne's probable presence inside the Intrepid made it more likely that his relatives – Mr. Long and Mr. Ferrell – also were inside the vehicle and involved in the robberies. Appellants acknowledged that the familial relationships had some relevance given the CODIS match, but they argued that the evidence was highly prejudicial in light of the preliminary nature of a match made only through the CODIS database.

The trial judge noted that the CODIS match was of limited value and suggested that evidence of the match likely never would have been shared with the jury had the parties not stipulated to its admission. The judge determined, however, that the familial relationships between appellants and Mr. Lesesne became relevant once the CODIS match was in evidence: "[T]he idea that a person who matches the DNA found on the steering wheel is not some complete stranger, but is somebody who is familiar, a relative of both of the defendants . . . certainly, to me, it has some relevance." The judge also found that any prejudice to appellants from the evidence of their familial relationships with Mr. Lesesne would be slight in light of the direct evidence already presented establishing that Mr. Long and Mr. Ferrell were the driver and front seat passenger in the Intrepid throughout the police chase of the vehicle. The judge thus overruled appellants'

objections and allowed the government to prove the familial relationships through birth certificates.

Appellants contend that the trial judge committed reversible error in admitting the birth certificates to prove their familial relationships with Mr. Lesesne. We review a trial judge's decision to admit or exclude evidence for abuse of discretion, *Plummer v. United States*, 813 A.2d 182, 188 (D.C. 2002), and we find none.

The trial judge correctly determined that appellants' familial relationships with Mr. Lesesne were relevant in light of the parties' stipulation about the CODIS match. As explained by Ms. Shoopman, that match made it probable that Mr. Lesesne was inside the Intrepid at some point, and Mr. Lesesne's probable presence inside the Intrepid in turn made it more likely that his half-brother (Mr. Ferrell) and first cousin (Mr. Long) were inside the Intrepid with him. Given the direct connection between the Intrepid and the armed robberies, the evidence of appellants' familial relationships with Mr. Lesesne thereby made appellants' involvement in the conspiracy and robberies more likely than it would have been without the evidence. *See id.* ("Evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the

action more probable or less probable than it would be without the evidence.'" (quoting *Street v. United States*, 602 A.2d 141, 143 (D.C. 1992))).

Relevant evidence, of course, may be excluded if its legitimate probative value is substantially outweighed by the risk of unfair prejudice. *Johnson v. United States*, 683 A.2d 1087, 1099 (D.C. 1996) (en banc) (adopting Rule 403 of the Federal Rules of Evidence). We agree with the trial judge, however, that the evidence of the familial relationships posed virtually no risk of unfair prejudice to Mr. Long and Mr. Ferrell. Officers Devlin and Lauderdale had already provided uncontradicted testimony that appellants were inside the Intrepid at the time of the police chase, and Ms. Shoopman's testimony regarding the preliminary nature of CODIS matches was in evidence. Other information already before the jury, moreover, suggested a close connection between members of the Lesesne family and Mr. Long and Mr. Ferrell. In particular, the jury knew that the Sprint Kyocera phone found in Mr. Ferrell's flight path, which had called appellants' phones shortly before the robberies, was registered to Lakeisha Lesesne; and Mr. Long's lawyer had told the jury in her opening statement that Mr. Long was at a family Christmas Eve dinner at the time of the robberies and that the jury might hear testimony about the dinner from Mr. Long's aunt, "Ms. Lesesne." The trial judge's decision to admit the birth certificates, therefore, was well within his discretion.

Appellants also complain about comments the prosecutor made about the CODIS match in his rebuttal closing argument to the jury. The prosecutor referred to the swab from the steering wheel as "the one that had the profile of – that was a match with Cordell Lesesne, [appellants'] cousin." The prosecutor added that "[t]he DNA in this case tells you that at some point Cordell Lesesne was in the car. We don't know when because DNA doesn't tell you anything about the timing[,] but at some point, he was [in] the car."

This was something of an overstatement, given Ms. Shoopman's testimony about the limited value of a CODIS match. Neither Mr. Long nor Mr. Ferrell objected to the prosecutor's rebuttal argument at trial, however, subjecting their contention on appeal to plain error review. *See United States v. Olano*, 507 U.S. 725, 732-36 (1993).

Under the plain error doctrine, appellants must establish that in failing to intervene *sua sponte* in the prosecutor's rebuttal closing argument (1) the trial judge committed error; (2) the error was plain, *i.e.*, clear or obvious; (3) the error affected substantial rights; and (4) a failure to correct the error would seriously

affect the fairness, integrity, or public reputation of judicial proceedings. *See Marshall v. United States*, 15 A.3d 699, 710 (D.C. 2011).

Appellants have not made the requisite showing. The evidence of the CODIS match and familial relationships was merely corroborative of the testimony of Officers Devlin and Lauderdale that appellants were inside the Intrepid at the time of the chase, and Mr. Ferrell's lawyer had already suggested to the jury in her own closing argument that Mr. Lesesne had been inside the car, stating, in reference to the CODIS match, that "maybe Mr. Lesesne has spent the night doing robberies." There is simply no danger that the trial judge's failure to intervene in the prosecutor's rebuttal closing argument affected the outcome of the trial or had a negative impact on the fairness, integrity, or public reputation of the proceedings.

### C. Sufficiency of the Evidence

Finally, Mr. Long and Mr. Ferrell challenge the sufficiency of the evidence supporting their convictions for unauthorized use of a motor vehicle and felony receiving stolen property.[5] Appellants contend that the evidence did not establish

---

[5] Mr. Long also challenges the sufficiency of the evidence on the charge of reckless driving. This issue is moot, however, given the government's concession

(continued…)

the required mental states for the two offenses or, with regard to felony receiving stolen property, prove that the Dodge Intrepid had a value of $1,000.00 or more.

"In reviewing a sufficiency challenge to a jury verdict, this court views 'the evidence in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence.'" *Bynum v. United States*, 133 A.3d 983, 986-87 (D.C. 2016) (quoting *Terry v. United States*, 114 A.3d 608, 616 (D.C. 2015)). "The evidence need not 'compel a finding of guilt beyond a reasonable doubt,' and it need not 'negate every possible inference of innocence.'" *Napper v. United States*, 22 A.3d 758, 770 (D.C. 2011) (quoting *Timberlake v. United States*, 758 A.2d 978, 980 (D.C. 2000)). Rather, a defendant pursuing an insufficiency claim on appeal "must establish 'that the government presented no evidence upon which a reasonable mind could find guilt beyond a reasonable doubt.'" *Carter v. United States*, 957 A.2d 9, 14 (D.C. 2008) (quoting *Peery v. United States*, 849 A.2d 999, 1001 (D.C. 2004)).

(…continued)
that Mr. Long's conviction for reckless driving merges with his conviction for felony fleeing and should be vacated on remand. Mr. Long does not challenge the sufficiency of the evidence of his conviction for felony fleeing.

The required mental states for the two offenses are well established. A person is guilty of unauthorized use of a motor vehicle only if he "knew" he was using the vehicle "without the consent of the owner or some other authorized person." *Agnew v. United States*, 813 A.2d 192, 197 (D.C. 2002). A person is guilty of receiving stolen property only if at the time he received, possessed, or obtained control of the property "he knew or had reason to believe that the property was stolen." *Moore v. United States*, 757 A.2d 78, 82 (D.C. 2000).

Testimony and crime scene photographs admitted at trial showed that the ignition of the Intrepid had been removed in its entirety, leaving a deep hole on the right side of the steering column that was clearly visible not only to the driver of the car, but to the front seat passenger and likely anyone sitting in the back seat as well. In plain view inside the car, moreover, were a brick and a screwdriver – the latter possibly used to start the car in the absence of a key or ignition. And Mr. Long (the driver) and Mr. Ferrell (the front seat passenger) fled from the police, first in the Intrepid, and then on foot, when the police tried to stop them after the hit from the license plate reader on the Intrepid.

We held in *Bynum* that clearly visible damage to a vehicle's ignition, coupled with evidence that the defendant led police on a car chase and then fled on foot, was "more than sufficient" to prove beyond a reasonable doubt the required mental states for the offenses of unauthorized use of a motor vehicle and receiving stolen property. 133 A.3d at 987-88. *Bynum* cannot be distinguished from the case now before us, and it thus compels the conclusion that the evidence was sufficient to prove beyond a reasonable doubt that appellants knew the Intrepid was stolen and that they were using it without the consent of the owner or someone authorized to consent on the owner's behalf. *See also Moore*, 757 A.2d at 82-83.

We reach the opposite conclusion regarding the government's proof of the value of the Intrepid.

To be a felony, punishable by up to seven years in prison, the offense of receiving stolen property must involve property with a value of $1,000.00 or more. D.C. Code § 22-3232 (c)(1) (2016 Supp.). Otherwise, the crime is a misdemeanor, punishable by up to 180 days in jail, as long as the property has some value. *Id*. at § 22-3232 (c)(2).

"It is important to keep in mind precisely what must be proven when the issue is whether a statutory value amount has been exceeded." *Hebron v. United States*, 837 A.2d 910, 913 (D.C. 2003) (en banc). "The matter to be determined is not the absolute value of the items stolen, as would be the case in, for example, a condemnation action. Rather, the proof must only show that the value, whatever it may be in absolute terms, exceeded the statutory minimum." *Id.* Nevertheless, the evidence "must be 'sufficient to eliminate the possibility' that the jury's verdict was 'based on surmise or conjecture' about the value of the property." *Zellers v. United States*, 682 A.2d 1118, 1121 (D.C. 1996) (quoting *Boone v. United States*, 296 A.2d 449, 450 (D.C. 1972)); *see also Hebron*, 837 A.2d at 916-17 (referring to the "forbidden surmise or conjecture"). Moreover, "when the proof indicates a value nearing [the statutory] minimum, such proof may need to be offered with greater precision." *Hebron*, 837 A.2d at 913.

The government presented the following evidence related to the value of the Intrepid. Brenda Holmes testified that she purchased the car, a 2002 model, at a used car auction. She said she kept the car, a four-door sedan, "pretty clean" and that the ignition was undamaged and in its proper place before the car was stolen. The car was returned to Ms. Holmes shortly after Christmas 2012, and she continued to drive it, using a butter knife to turn it on (in the absence of the

ignition, which she could not afford to have repaired), for the nearly two years between the robberies and her testimony at trial in October 2014.

The evidence also showed that the Intrepid ran well enough to enable appellants and their co-conspirators to drive to and from the four robbery scenes and then to lead the police on a brief chase during which they drove the car significantly faster than thirty miles per hour – the speed at which Officers Devlin and Lauderdale were traveling when the Intrepid pulled away at the beginning of the chase and headed toward Maryland. Photographs, moreover, showed that the upholstery and carpeting inside the car were dirty and well worn but not ragged, and that the body of the car was in decent condition, with no significant dents or scratches beyond what one would ordinarily expect to see on a ten-year-old car in a busy urban area.

In *Curtis v. United States*, 611 A.2d 51 (D.C. 1992), we held that a "nearly new" Ford Taurus, rented from Hertz Rent-A-Car and "in good condition" and "fully operable at all times," so clearly had a fair market value of more than $250.00 (the statutory minimum at the time for the offense of felony receiving stolen property) that the sufficiency of the proof of value was "certainly not a close

question." *Id*. at 52. The same cannot be said here, especially with the statutory minimum now four times as high.

The government presented no evidence of the cost of the Intrepid when new, the price Ms. Holmes paid for it at the auction, or even the year in which she bought it. Nor did the government establish anything about the car's mileage, maintenance history, or Bluebook value at the time of the robberies (or any other time). Unlike the situation in *Curtis*, therefore, this was indeed a close question. The jury had no way of knowing whether the car had 25,000 or 250,000 miles on it, whether the car had been serviced regularly or not at all, or whether in 2012 the $1,000.00 statutory minimum compared favorably or unfavorably with industry-wide ranges of resale prices for ten-year-old Intrepids in similar condition. There was simply no basis in the evidence for the jury to know the amount a willing buyer would have paid to a willing seller for the car on the open market. *See Hebron*, 837 A.2d at 913 n.3 ("Property value . . . is its market value at the time and place stolen, if there is a market for it.") (quoting LAFAVE, CRIMINAL LAW, § 8.4(b) (3d ed. 2000)).

We permit jurors to use "the saving grace of common sense" and their "everyday experience" to draw reasonable inferences from the evidence presented

in a trial, particularly where the evidence pertains to stolen items "of a general type familiar to ordinary [people]." *Hebron*, 837 A.2d at 914, 916. Here, however, any inferences drawn by the jury concerning the value of the Intrepid necessarily crossed the line from permissible reliance on common sense and life experience into the prohibited territory of surmise and conjecture. We conclude, therefore, that the evidence of the value of the Intrepid was insufficient as a matter of law to support appellants' convictions for felony receiving stolen property.

Those felony convictions accordingly cannot stand. Because the Intrepid certainly had some value, however, we will remand the cases to the trial court for the entry of convictions for misdemeanor receiving stolen property. *See Zellers*, 682 A.2d at 1122 (directing that a first-degree theft conviction be reduced to second-degree theft when the evidence of value, needed to prove first-degree theft, was insufficient); *see also Robinson v. United States*, 100 A.3d 95, 110-11 (D.C. 2014) ("It is well-established that this court 'may direct [or allow] the entry of judgment for a lesser included offense when a conviction for a greater offense is reversed on grounds that affect only the greater offense.'" (alteration in original) (quoting *Gathy v. United States*, 754 A.2d 912, 919 (D.C. 2000))).[6]

---

[6] Mr. Ferrell argues in a *pro se* supplemental brief that the trial judge committed reversible error by instructing the jury on aiding and abetting liability,

(continued…)

## III. CONCLUSION

For the foregoing reasons, we remand to the Superior Court for the limited purposes of (1) vacating appellants' convictions for felony receiving stolen property and entering, in their place, convictions for misdemeanor receiving stolen property, with resentencing as appropriate, *see Swinton v. United States*, 902 A.2d 772, 778 (D.C. 2006); and (2) vacating Mr. Long's merged conviction for reckless driving, see *supra* n.5. The judgments of the Superior Court are otherwise affirmed.

*So ordered.*

---

(…continued)

when the indictment was silent on aiding and abetting and there was "no need" for the instruction in light of the conspiracy charge alleged in the indictment. Mr. Ferrell raised no objection to the aiding and abetting instruction in the trial court, and his contention on appeal is therefore limited to review for plain error. We find no plain error and, indeed, no error at all. "The indictment need not include a charge of aiding and abetting for the judge to give that instruction," *Head v. United States*, 451 A.2d 615, 626 (D.C. 1982), and instructions on the alternate theories of co-conspirator and aiding and abetting liability may be given if both are supported by the evidence, *Wilson-Bey v. United States*, 903 A.2d 818, 842 (D.C. 2006) (en banc). That clearly was the case here, where the evidence reflected varying and changing roles played by appellants and the other occupants of the Intrepid in the course of the armed robberies committed against Mr. Richards, Mr. Becker, Mr. Bartek, and Mr. Mitchell.